IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 14, 2024

## STATE OF TENNESSEE v. KIREEK KASEEM STEELE

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2021-CR-832  William R. Goodman, III, Judge**

_____

**No. M2023-00695-CCA-R3-CD**

_____

A Montgomery County jury convicted the defendant, Kireek Kaseem Steele, of rape, sexual battery, rape of a child, and two counts of aggravated sexual battery for which he received an effective sentence of thirty years' incarceration.  On appeal, the defendant challenges the sufficiency of the convicting evidence on all five counts.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

M. Todd Ridley, Assistant Public Defender, Tennessee Public Defenders Conference, Franklin, Tennessee (on appeal); Robert P. Koewler and Crystal Lewis, Assistant Public Defenders, Clarksville, Tennessee (at trial), for the appellant, Kireek Kaseem Steele.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Robert J. Nash, District Attorney General; and Kimberly S. Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

This case involves allegations of sexual abuse by the defendant against three minor brothers, Z.S., K.O.C. and K.A.C.,[1] that took place in the children's home in late 2020 and

---

[1] In order to protect minor victims of sexual abuse, this Court refers to victims and their family members by initials.  No disrespect is intended by this practice.

early 2021. As a result, the defendant was indicted in Counts 1 and 2 of rape and sexual battery against Z.S., in Counts 3 and 4 of rape of a child and aggravated sexual battery against K.O.C., and in Count 5 of aggravated sexual battery against K.A.C. The defendant admitted to touching two of the victims' penises but claimed he was sleepwalking, and he denied the other allegations.

At trial, the victims' mother, T.S., testified that the defendant was a friend of the family and visited them regularly. Although she had only known the defendant a few years, her husband had known him since childhood and she trusted the defendant. T.S. and her husband had eight children, and when the defendant visited, he helped babysit the children as well as cook and clean. The defendant had a good relationship with the children and often spent time with them alone.

T.S. explained that the defendant spent the night in their home when he traveled back and forth between Tennessee and Georgia. The defendant usually slept on the couch in the "community room" upstairs or in an extra twin bed in Z.S.'s room because "he said he had problems with his back." However, on occasion T.S. found the defendant sleeping on the floor in the bedroom shared by her twin sons, K.O.C. and K.A.C. T.S. found this unsettling, wondering why the defendant would want to sleep on the floor in a child's bedroom, but she pushed her concerns aside because she trusted the defendant.

T.S. described that the defendant and Z.S. "seemed to have a really . . . friendly relationship." The defendant "was able to talk with [Z.S.] and get him to open up about a lot of things, because, of course, it's sometimes hard to talk to teenagers, just being a parent." T.S. said that K.O.C. had "the closest relationship with [the defendant]" and was "very trusting of being around [the defendant]." K.A.C. "saw [the defendant] as a buddy, somebody he could . . . laugh with, joke around, spend time with. That was mostly it."

On January 16, 2021, T.S. was shopping when she learned there was an issue involving the defendant and headed home immediately. At that point, T.S. did not know what the issue was or even that the defendant had spent the night. T.S. recalled that earlier that day, K.O.C. told her that "he needed to talk to [her] about [the defendant]" but they had yet to talk. Once T.S. arrived home, the defendant told her and her husband that he needed to talk to them as soon as possible. However, when they sat down to talk, they sat in silence for "[h]ours" until T.S.'s husband fell asleep. Once T.S.'s husband was asleep, the defendant asked if he and T.S. could leave the house to talk.

In a nearby parking lot, the defendant began by apologizing "for what he's about to say." The defendant then explained that he had been sleepwalking and dreaming "of petting a dolphin" when he "woke up and found out that he was touching . . . [K.O.C.]" The defendant said that "the same dream had happened . . . and that it happened to

- 2 -

[K.A.C.]" too. The defendant also claimed he "had the same dream" but with "a different mammal" one night when he was working as a cook for a family in the Smoky Mountains. He said he "broke his nose on the nightstand" during that incident. The defendant did not disclose any sexual contact occurring with Z.S. T.S. stated that in all the times the defendant stayed in their home, she had never seen the defendant sleepwalk or heard mention of him having a sleepwalking problem.

T.S. was "confused" and "in denial," not wanting the defendant's disclosure to be true. She was also afraid of how her husband was "going to react to such a story" but knew they needed to tell him "what exactly had happened." When they returned to the house, the defendant told T.S.'s husband the same story, but he never told either of them "exactly where and how he did it." T.S. and her husband did not immediately report the abuse to the police because they wanted to discuss it with their children first. They spoke with the children, and the victims provided specific details of the abuse. They also learned that Z.S. had been abused, and T.S. did not believe Z.S. was "just jumping on the bandwagon." At some point, K.O.C. disclosed the abuse at school and law enforcement became involved.

Detective Sean Walden with the Special Victims Unit of the Clarksville Police Department investigated the case, beginning with observing the children's interviews at the child advocacy center. Based on those interviews, Detective Walden identified the defendant, who he learned was "[a]lmost like a brother to the . . . father, so . . . an uncle to the children," as a suspect. Detective Walden then interviewed the defendant, a portion of which was played for the jury.

In the interview, the defendant stated that he was forty-two years old, and he considered the victims' father his "godbrother" and the victims his "nephews." The defendant stayed with his godbrother's family in Clarksville regularly. The defendant described an incident that occurred on Christmas Eve 2020 when he was working as a personal chef for a group in the Smoky Mountains. According to the defendant, he had a dream in which he was rescuing a dolphin that was stuck in some rocks on the beach and he was falling down in the dream. He awoke to find that he had actually fallen and broken his nose.

Once the defendant returned to Clarksville, an incident occurred when he was spending the night at the victims' house. The defendant was sleeping on the couch in the community room, and K.O.C. was sleeping on the ottoman. He could not remember all of the details, but he had a dream in which he "was involved with someone in the dream." When he awoke, he found that "his hand was on his nephew." The defendant apologized to K.O.C. and told him it had been an accident. A few days later, the defendant spent the night at the victims' home again. This time, the defendant had the same kind of dream and woke up to find himself touching K.A.C. He immediately told K.A.C. what had happened,

- 3 -

but K.A.C. claimed not to know what the defendant was talking about. The next day, the defendant told the victims' parents about the incidents. The defendant believed that the incident with K.O.C. occurred around January 11 or 12, 2021, and the incident with K.A.C. around January 16.

In response to questioning by Detective Walden, the defendant admitted he had touched K.O.C.'s and K.A.C.'s penises but claimed he had been sleepwalking and dreaming of petting a dolphin. The defendant did not remember performing oral sex on K.O.C., and he also did not "recall" touching Z.S.'s penis or performing oral sex on him. The defendant admitted that he apologized to K.O.C. and K.A.C. but denied telling them not to disclose the abuse.

Z.S. testified that he was born on June 26, 2006, and was fourteen years old when the abuse occurred. Z.S. said that the defendant was a friend of his father and essentially a part of their family. Z.S. got along with the defendant and called him "Uncle Kireek." Z.S. felt that he could trust the defendant until something happened to breach that trust.

One night in late November or early December 2020, Z.S. was asleep in his bed, wearing blue and black Under Armour shorts and a black long-sleeved Under Armour shirt, and the defendant was sleeping in the other twin bed in Z.S.'s room. Around 1:00 a.m., Z.S. awoke to find the defendant kneeling next to his bed and touching Z.S.'s penis with "[h]is hand and his mouth." The defendant was using his hand to "rub[] . . . "[u]p-and-down" on Z.S.'s penis, while the defendant's mouth was "on the tip of [Z.S.'s] penis." Z.S.'s shorts and underwear had been pulled down to his ankles.

Z.S. described the defendant's actions as "very disturbing, uncomfortable, very uncomfortable." Z.S. said that "it took [him] a while to figure [out] what was happening," but when he did, he "pushed [the defendant] off by his face and ran into [the] bathroom." The defendant chased after him, but Z.S. was able to shut and lock the door. From the other side of the bathroom door, the defendant said to Z.S., "I'm sorry. I shouldn't have done that and I didn't mean to do that." The next day, the defendant told Z.S. "not to tell anybody, and that he had apologized, and he wasn't going to do it to anybody else or anybody again." Z.S. did not tell his parents about the incident right away because he believed the defendant and because the defendant "was so close to everybody else that I kind of didn't want him to leave[.]" Z.S. denied making up the story so his brothers would feel better and expressed that he felt "very guilty" for not disclosing the incident sooner because that might have prevented his brothers from also being abused.

Z.S. knew the defendant was awake during the encounter because the defendant's eyes were open, he "instantly reacted" when Z.S. woke up, and he chased Z.S. to the bathroom. Z.S. said that in all the times the defendant had stayed at their house, he had

never seen the defendant sleepwalk nor heard the defendant mention having a sleepwalking problem.

K.O.C. testified that he was born on February 19, 2008, and was twelve years old when the abuse occurred. He specifically recalled he was "still 12, turning 13." K.O.C. stated that he also had a close, trusting relationship with the defendant and referred to him as "Uncle Kireek." The defendant frequently spent the night at their home and usually slept on the couch in the community room.

One night in January "going towards February" 2021, K.O.C. and K.A.C. fell asleep on the couch in the community room while watching television with the defendant. At some point, K.O.C. woke up to find the defendant touching his "no-no square," which he identified by circling the genital area on a drawing of a male body. The defendant's hand was initially on K.O.C.'s clothes, rubbing in an up-and-down motion. Then, the defendant turned K.O.C. over, pulled down his clothes, and put his mouth on K.O.C.'s "no-no square" and moved in an up-and-down motion. K.O.C. believed that the defendant was awake during the encounter because his eyes were open. K.O.C. had never seen the defendant sleepwalk or heard the defendant mention having a sleepwalking problem.

K.O.C. did not try to stop the defendant because he "was in shock and traumatized." K.O.C. eventually tried to turn back over, which caused the defendant to stop. The defendant told K.O.C. not to tell anyone because the defendant could get hurt. K.O.C. turned over on the couch and cried quietly. K.O.C. did not scream out for his brother, who was in the same room, because he "was trying to make sure he didn't get hurt." K.O.C. did not tell his parents right away because he "didn't know what else could happen after that." K.O.C. said that he later experienced suicidal thoughts and felt like he had failed his twin brother.

K.A.C. testified that he was born on February 19, 2008, and was twelve or thirteen years old when the abuse occurred. Like his brothers, K.A.C. explained the defendant's relationship with the family and said that he trusted and liked the defendant. K.A.C. could not recall the date of the incident but said it occurred in the community room when he was watching a movie with the defendant. K.A.C. fell asleep on the couch and awoke to find the defendant "touching [his] private parts." K.A.C.'s shirt had been pulled up and pants pulled down, and the defendant was touching his skin. The defendant's hands were "rubbing on it, and going up-and-down[.]" The sexual contact made K.A.C. feel "very uncomfortable," but he was "in shock and . . . could not move."

K.A.C. eventually "pushed [the defendant] off, or kicked him, or something." K.A.C. went to his bedroom, and the defendant followed. The defendant pleaded, "I'm sorry . . . Don't tell no one or I'll go to jail." K.A.C. believed the defendant was awake

during the encounter because he apologized afterwards "[s]o . . . he must have noticed what he was doing." K.A.C. said that he had never seen the defendant sleepwalk or heard the defendant talk about sleepwalking. K.A.C. was scared and did not immediately tell his parents because they "had been through a lot" and he worried "things would have went bad, very bad" if he told them. K.A.C. recalled that the incident happened on a Saturday night and that he told K.O.C. the next morning when they were getting ready for church.

Upon the conclusion of the proof, the jury convicted the defendant as charged in all five counts, and after a sentencing hearing, the trial court imposed an effective thirty-year sentence. This appeal followed.

## *Analysis*

On appeal, the defendant challenges the sufficiency of the convicting evidence in all five counts. The State responds that the evidence is sufficient, and we agree with the State.

## *Sufficiency*

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

- 6 -

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury.  *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)).  This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.  *Id.*

## I.  Counts 1 and 2

The defendant challenges the sufficiency of the evidence relative to Counts 1 and 2, the rape and sexual battery of Z.S., asserting that the State failed to establish lack of consent.  He asserts the "proof established, at most, that Z.S. was asleep at the time of the sexual contact," and therefore, could have qualified as "physically helpless," *see* Tennessee Code Annotated §§ 39-13-503(a)(3)(C) and -505(a)(3), but the State indicted on lack of consent.  *See id.* §§ 39-13-503(a)(2) and -505(a)(2).  The defendant points out that a "physically helpless" person is "unconscious, asleep or for any other reason physically or verbally unable to communicate unwillingness to do an act."  *Id.* § 39-13-501(5).

As charged in this case, "[r]ape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" where "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]"  *Id.* § 39-13-503(a)(2).  "Sexual penetration" includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the

genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). "Sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" where "[t]he sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent[.]" *Id.* § 39-13-505(a)(2). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). "'Intimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

We initially observe that Z.S., a fourteen-year-old minor, was legally incapable of consenting to sexual penetration by the defendant. Our courts have held that a minor cannot consent to any form of statutory rape, rape of a child, or rape by coercion. *See State v. McDaniel*, 2022 WL 558283, at *7 (Tenn. Crim. App. Feb. 24, 2022) (citing *State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013); *State v. Jones*, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994); *State v. Chandler*, 2014 WL 3055972, at *18 (Tenn. Crim. App. July 7, 2014), *perm. app. denied* (Tenn. Nov. 20, 2014)). In *Chandler*, the Court specifically observed, "We see no reason to conclude that a fourteen-year old who would be incapable of consenting to a statutory rape would somehow be capable of consenting to a rape by coercion." *Chandler*, 2014 WL 3055972, at *18. It follows then that a fourteen-year-old could not consent to fellatio by a forty-two-year-old. As such, the defendant knew or had reason to know at the time of the contact that the victim did not consent.

Moreover, the jury could have reasonably determined that Z.S. did not consent to the defendant's sexual contact because he was asleep. It would be illogical to presume that the act of sleeping communicates, either expressly or impliedly, consent to sexual acts with anyone who happens to be nearby. *See State v. Madison*, 2012 WL 1589045, at *21 (Tenn. Crim. App. May 4, 2012) (stating that "[t]he victim's testimony that he was asleep when the Defendant began his sexual assault satisfies the element that the Defendant had reason to know that the victim did not consent"), *perm. app. denied* (Tenn. Sept. 19, 2012); *see also State v. Roderick*, 2010 WL 3823423, at *5 (Tenn. Crim. App. Sept. 30, 2010) (upholding rape by lack of consent conviction where "the victim awoke to find the defendant on top of her, having already penetrated her vagina with his penis"). Short of wearing a "don't touch" sign to bed, one should be able to sleep at night without the danger of communicating consent to any and all sexual contact by simply being asleep.

As further evidence of Z.S.'s lack of consent, Z.S. testified that when he awoke, "it took [him] a while to figure [out] what was happening," but when he did, he "pushed [the

defendant] off by his face and ran into [the] bathroom." Z.S. described the defendant's actions as "very disturbing, uncomfortable, very uncomfortable." Z.S. said that the defendant apologized immediately afterwards and again the next day. This testimony, accredited by the jury, indicates that the defendant acted without consent and that he knew or should have known Z.S. did not consent.

The defendant also claims that there was a fatal variance between the indictment and the proof at trial because the State proved that Z.S. was "physically helpless" and not that the defendant acted without consent. Initially, the defendant has waived this claim as a stand-alone issue because he did not raise it in the court below. In any event, as we have addressed above, there was sufficient evidence that the defendant acted without consent and knew or should have known Z.S. did not consent. The fact that the State could have also pursued convictions under a theory of "physical helplessness" does not mean there was a fatal variance between the indictment and proof. The proof is sufficient to establish that the defendant is guilty of the crime as charged.

The defendant further argues that the variance problem was "compounded" by the trial court's failure to define "consent" in the jury instructions and, instead, include a definition for "force." The defendant, however, acknowledges that the jury instructions "tracked the indictment by listing 'lack of consent' as an element of both offenses." Again, the defendant has waived this claim as a stand-alone issue because he raised it for the first time on appeal but, in any event, any error was harmless. A review of the jury instructions shows that a definition for "force" was included in a string of other definitions, likely left in by clerical oversight. However, the rest of the charge correctly refers to lack of consent, and in its closing argument, the State focused on Z.S.'s lack of consent with no mention of the element of force. There was no mention of force in the entire trial. Waiver notwithstanding, we conclude that the instructional error did not affect the outcome of the trial.

## II. Count 3

The defendant challenges the sufficiency of the evidence relative to Count 3, the rape of a child of K.O.C., asserting that the State failed to establish that he knew, or should have known, that K.O.C. was less than 13 years of age.

Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than eight (8) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" has been previously defined *supra*. Our supreme court has explained that the offense of rape of a child may be separated into two elements, "unlawful sexual penetration" and the age of the child. *State v. Clark*, 452 S.W.3d 268, 296 (Tenn. 2014). The statute does not supply

a mens rea for either element, therefore, "the generic mens rea statute fills in the gap." *Id.*; *see* Tenn. Code Ann. § 39-11-301(c). "Because the act of sexual penetration relates to the result of the defendant's conduct," the element of "unlawful sexual penetration may be done intentionally, knowingly, or recklessly." *Id.* (citation and footnote omitted). Similarly, "a defendant may satisfy" the element related to the age of the child victim "when he or she is reckless, knowing, or intentional regarding the attendant circumstance of the age of the victim." *Id.* at 297 (citing *State v. Blanton*, 2009 WL 537558, at *14 (Tenn. Crim. App. Mar. 4, 2009) ("[R]eckless conduct is sufficient for the element that the victim is less than thirteen years old."), *perm. app. denied* (Tenn. Aug. 24, 2009)).

The defendant argues that "the State presented no evidence suggesting that [the defendant] knew, or should have known, that K.O.C. was less than 13 years of age." However, based on the proof, the jury could have reasonably concluded that the defendant was at least reckless with respect to K.O.C.'s age. A person acts recklessly "when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur [,]" and "[t]he risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-11-302(c).

The proof was undisputed that K.O.C. was twelve years old at the time of the rape in January 2021. Although his birthday was just a few weeks away, K.O.C. was clear that he was "still 12, turning 13." The defendant had known the victims' father since childhood and had been regularly involved with the family for at least two years. The victims called the defendant "Uncle Kireek," and the defendant considered the victims his "nephews." According to the victims' mother, K.O.C. had "the closest relationship with [the defendant]." Contrary to the defendant's assertion that "the State essentially treated this charge as a strict liability offense," based on the defendant's close relationship and frequent interaction with the victims' family, the jury could have reasonably concluded that, through this close relationship, the defendant knew K.O.C.'s age or was aware of, but consciously "disregard[ed] a substantial and unjustifiable risk," that K.O.C. was less than thirteen years old. The defendant is not entitled to relief.

## III. Counts 4 and 5

The defendant lastly challenges the sufficiency of the evidence relative to Counts 4 and 5, the aggravated sexual batteries of K.O.C. and K.A.C., asserting that the State failed to establish that he acted "for the purpose of sexual arousal or gratification."

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant" where "the victim is less than thirteen (13) years of age." Tenn. Code Ann. §

- 10 -

39-13-504(a)(4). "Sexual contact" and "intimate parts" have been previously defined *supra*.

The defendant concedes that "the State, at least under the governing standard of review, established that [he] touched, or attempted to touch, K.O.C. and K.A.C.'s intimate parts," but asserts the State failed to establish he "acted with sexual intent." In support of his assertion, the defendant claims that the State did not present "evidence beyond the touching itself" and essentially "argued that it goes without saying that [the defendant] acted with sexual intent because no other reason could have possibly existed."

The evidence shows that the defendant, on separate occasions, approached K.O.C. and K.A.C. while they were asleep, pulled down their pants and underwear, and "rubbed" their penises in an "up and down" motion. The defendant also performed fellatio on K.O.C. while rubbing K.O.C.'s penis with his hand. After the incidents, the defendant apologized to both boys and told them not to tell anyone. A jury may draw upon its "common knowledge" to infer that a defendant "forced intimate contact for the purpose of sexual arousal or gratification." *See State v. Johnson*, 2013 WL 501779, at *10 (Tenn. Crim. App. Feb. 7, 2013), *perm. app. denied* (Tenn. Aug. 14, 2013). Moreover, as this Court has explained, the aggravated sexual battery "statute merely requires touching that can be 'reasonably construed as being for the purpose of sexual arousal or gratification.'" *Id.* at *12 (quoting *State v. Chisenhall*, 2004 WL 12177118, at *3 (Tenn. Crim. App. June 3, 2004)).

In the light most favorable to the State, the jury could have reasonably construed the defendant's actions, detailed above, as for the purpose of sexual arousal or gratification. *See State v. Horn*, 2016 WL 561181, at *5 (Tenn. Crim. App. Feb. 12, 2016) (holding there was sufficient evidence for the jury to find that the defendant touched the victim for the purpose of sexual arousal or gratification, specifically noting that the defendant told the victim "not to tell anyone"). As stated poignantly by the Montana Supreme Court: "[M]en usually do not go around rubbing the [penises] of small [boys]. Indeed, someone that would consistently rub the [penis] of [a] small [boy] is obviously committing a sexual assault and is doing so for his own strange sexual desire." *Montana v. Olson*, 951 P.2d 571, 578 (Mont. 1997). The defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____

J. ROSS DYER, JUDGE